WILLIAM MORRIS *vs.* ETHELDRA HARRIS.—*June* 1850.

In this State, co-heirs are assimilated to coparceners, constituting together one heir.

At common law, every partition between coparceners, has an implied warranty annexed, that if either party loses any of his share by eviction, on

account of defect of title in the ancestor, he may enter upon the others and defeat the partition as for condition broken.

But all covenants arising from implication of law, are necessarily controlled or annulled by express covenants between the parties.

A conveyance made by a *feme covert* under a privy examination as provided by the act of 1776, ch. 14, operates as an estoppel against her as effectually as if she were *sui juris.*

When a *feme covert* parts with her property by any form or mode of conveyance executed under the provisions of said act, she is by her own voluntary act precluded from disavowing it, and is bound by the express covenants, conditions and terms of her own deed.

When a party covenants for quiet enjoyment and possession against himself and those claiming under him, he excludes the idea of a covenant against all the world.

Two co-heirs executed a deed of partition in which they mutually covenanted that each should hold his part of the land free and discharged from all title, interest, claim and demand of the other. HELD: that one of these co-heirs was a competent witness for the other in an action brought by the latter against a third party, involving the title to a part of the estate conveyed to the plaintiff by the deed of partition.

A widow who has received her dower with the consent of the heirs at law, is a competent witness for the latter to prove the seisin of her husband in lands allotted to them.

Dower may be assigned by parol.

In this case a parol contract for the sale of lands made by the ancestor of the complainant with the defendant, was decreed to be specifically executed upon proof that it was partly performed by delivery of possession in pursuance of the agreement.

APPEAL from the *Court of Chancery.*

The bill in this case was filed on the equity side of *Charles* county court, on the 5th of November 1833, by the complainants, *Morgan Harris* and *Etheldra Harris,* (the appellee,) his wife. It alleges, that in 1817, *Samuel Chapman* of said county, discovering a vacancy adjoining his lands on the Potomac river, agreed with *William Morris,* (the appellant,) that they together should take up the same, that the patent should issue to *Morris,* but the land should be held equally between them, each owning one half thereof; that *Chapman* paid $77.27, the caution money, on the 1st of March 1817, to the State, and the receipt of the treasurer therefor is exhibited with the bill. The bill further charges, that in pursuance of

this agreement, the land was patented to *Morris*, and called "*Morris' Landing*," containing fifty-two and one-fourth acres. That afterwards said *Chapman* being about to sell all his lands on the Potomac, purchased of said *Morris* all the latter's interest in said tract of land, being one moiety thereof, at the price offered to *Chapman* for his adjoining lands, to wit: $— per acre; that in part performance of this contract, *Chapman* was put in possession of the whole tract, and remained in possession thereof from that time until his death, in 1825; that complainant *Etheldra*, is one of the heirs at law of said *Chapman*, and in the division of his real estate, this land was allotted to her as a portion of her inheritance, and that complainants have been and still are in possession of the same, but the said *Morris* has never executed a deed therefor, but has instituted an action of ejectment to recover possession thereof. The bill then prays for an injunction to restrain this ejectment suit, and that *Morris* may be decreed to convey the title to the land to complainants, and for general relief.

The *answer of William Morris,* sets forth that defendant is ignorant of the alleged division of *Samuel Chapman's* estate, and positively denies any contract or agreement on his part, for or touching one-half or any part of "*Morris' Landing*." That respondent being interested in certain lands formerly belonging to one *Knox*, was informed of the vacancy called "*Morris' Landing*," and accordingly in 1817, obtained a special warrant to affect said vacancy, as appears by the patent and the surveyor's records exhibited with the answer. That about the same time, respondent for the benefit of himself and one *Hanson*, obtained another special warrant to affect other vacancy, and finding that *Samuel Chapman* had also obtained another warrant of resurvey, it was agreed between respondent and *Hanson*, and *Chapman*, that the warrant obtained by *Chapman*, should be executed instead of the one for the joint use and benefit of *Hanson* and respondent, and that the costs of the survey, &c., should be paid by respondent and *Chapman;* that this warrant was executed, and all the costs paid by respondent, and the warrant was laid on lands entirely differ-

ent from "*Morris' Landing*," and the lands thus taken up by *Chapman* were called "*Smithfield*." That *Chapman* paid the caution money on "*Morris' Landing*," not because he was interested therein, but because respondent paid the whole cost of "*Smithfield*." The answer then denies the receipt of any consideration, or that respondent ever sold or offered to sell to *Chapman* either "*Smithfield*" or "*Morris' Landing*," that *Chapman* always admitted "*Morris' Landing*" to be respondent's property, and rented the same for several years before his death from respondent, who had the exclusive possession thereof for several years after the survey and patent aforesaid, and rented the same to sundry persons. It then denies that there was any agreement, parol or written, and insists "that if there was any agreement, it was not reduced to writing and signed by the parties as required in such cases by law," and then also denies that the caution money was paid, or possession taken under any such agreement as set up in the bill.

The testimony of *John G. Chapman*, the brother of the appellant, and son of said *Samuel Chapman*, and of *Mrs. Elizabeth Chapman*, the widow of said *Samuel Chapman*, was taken, the purport of which, as well as of the other testimony, is sufficiently stated in the opinion of this court. The deed of partition between *John G. Chapman* and his sister, (the appellee,) and her husband, filed with the commission, is also sufficiently stated in the opinion. The defendant objected to the testimony of *John G.* and *Elizabeth Chapman*, on the ground that they were interested in the result of the suit. Certain copies of accounts were filed in the cause referred to in an agreement of counsel, which contains among others, the following clause: "It is further agreed, that the copy of certain accounts already filed in this cause by defendant, may be read as a copy properly introduced of accounts of *Samuel Chapman*, deceased, in the proceedings mentioned, the original being filed by *John G. Chapman*, in the case of *John G. Chapman, Adm'r, vs. the present defendant,* and the proceedings in the last mentioned case may be read, to show in what manner and under what circumstances the said accounts were made."

The cause having been removed to the court of Chancery, the Chancellor, *(Johnson,)* on the 18th of April 1848, passed a decree ordering the agreement made between *Samuel Chapman,* in his lifetime, and the defendant, to be specifically executed, and the latter to convey the title to said land to complainant, upon her paying the purchase money therefor, or producing satisfactory evidence that the same had been paid.

From this decree, the defendant appealed to this court.

The cause was argued before SPENCE, MARTIN and FRICK, J.

MAY and R. J. BRENT, for the appellant.

The principal questions on the facts are: 1. Whether *Samuel Chapman* was a partner in the acquisition of "*Morris' Landing?*" To establish the affirmative of this proposition, the appellee relies on the evidence of *John G. Chapman,* and *Mrs. Elizabeth Chapman:*—the first, the son and co-heir, and the last, the widow of *Samuel Chapman.* The appellant has excepted to the competency of both of them. *John G. Chapman* is incompetent, because he is co-heir with *Etheldra Harris,* his sister, and if she is evicted from *Morris' Landing,* is bound to make good her loss for *owelty* of partition, notwithstanding the covenant in the deed of *Harris* and wife to the witness, because a married woman *cannot* covenant, and the liability of the witness is therefore direct and palpable, unless discharged by that covenant, and he ought to have been made a party to this suit. *Mrs. Elizabeth Chapman,* is incompetent, because *she is proved to be widow* of *Samuel Chapman,* and could claim her dower if *Etheldra Harris,* recovers the property. But admitting these two witnesses to be ruled competent, still they are insufficient to counteract the positive denials of the answer, because they know nothing themselves, of the matter, save by the declarations of the appellant *Morris:* and we submit, that his unsworn declarations cannot impeach his *positive oath.* There is nothing to corroborate these declarations, save the receipt of the caution money, *which is* completely neutralised by the accounts on the books of *Samuel*

*Chapman*, charging *Morris* with the whole amount of that receipt. Then the allegation of partnership *in the land*, is supported alone by proof of *Morris*' declarations, against which we offer the *counter-declarations* of the other party, *Samuel Chapman*, and the fact that *Chapman* swore as witness for *Morris*, in a suit by the latter to recover rent of this very land, and the more *pointed* fact of *Chapman charging Morris* with the whole amount of that receipt. And lastly, the facts proved that for several years after the survey and patent of *Morris' Landing*, *Morris* was in the exclusive possession thereof, by renting it to *Rye* and *Dunnington*, as *conclusively proved;* and that *Perry* discovered the vacancy, and informed *Morris* of it. 2. Whether *Morris* ever sold out his interest to *Chapman?* This also depends upon the competency of the two witnesses, *John G. Chapman* and *Elizabeth Chapman* Besides, no written evidence of such sale is produced; no proof of payment of purchase money; or even that *a credit was allowed to Morris*, as promised, according to the evidence of *Elizabeth Chapman*. On this matter, the accounts in the record, although full, between these parties, would seem to negative the idea of such a sale: as nothing relating to it appears in those voluminous accounts. 3. Was *Samuel Chapman* put in possession under such agreement, so as to amount to part performance?

It does not appear that his possession was referrible to such agreement, but must have been taken as tenant merely. Nor does it appear, by any competent or incompetent testimony in the cause, what were the full and complete terms of the alleged agreement, so as to enable the court to decree specific performance.

Finally, the statute of frauds is a flat bar to the whole of this pretended claim, and is sufficiently pleaded in the answer.

THOS. S. ALEXANDER for the appellee, insisted that the chancellor decreed rightly, and his decree ought o be affirmed.

FRICK, J., delivered the opinion of this court.

The bill in this case was filed by *Morgan Harris* and his wife *Etheldra*, (formerly *Chapman*,) to enjoin an ejectme suit brought by the appellant, for a tract of land called "*Morris' Landing;*" and to obtain a conveyance of the legal title to the same, by a decree for the specific performance of an agreement between the appellant and *Samuel Chapman* the ancestor of the appellee, in relation to the sale of said land; which agreement it is alleged was in parol, and part performed and executed between the said parties, in the lifetime of *Samuel Chapman*.

The complainants, *Morgan Harris* and *Etheldra* his wife, claimed in right of said *Etheldra*, as one of the heirs at law of said *Samuel Chapman*, in virtue of a deed of partition between them, and the other heir at law, *John G. Chapman*, whereby the land in question was allotted to, and vested in her exclusively. The agreement sought to be enforced was as before said by parol, and the bill charges, that it was partly performed by the payment of the purchase money agreed on, and by the delivery of the premises by *Morris* to *Chapman* in his lifetime, and in pursuance of the agreement.

*Morgan Harris* died since the filing of the bill.

The answer denies the existence of any such agreement as is charged in the bill; but sets up another and a totally different agreement, with regard to a parcel of land called "*Smithfield.*" That *Samuel Chapman* always admitted "*Morris' Landing,*" to be the appellant's property, and had rented the same for several years before his death from the appellant; and that there was no part performance of any agreement between them concerning *Morris' Landing*. And he relies upon the statute of frauds.

The deed of partition is to the purport following: After reciting that the parties hold as tenants in common in equal shares, the lands of which they are seized in fee as heirs at law of *Samuel Chapman*, and that they have agreed to divide and hold their respective shares in severalty, it is thereupon covenanted, granted and agreed by and between them, that each

shall hold, possess and enjoy in severalty the respective portion allotted by the said partition; and which each of them by the said deed of partition doth grant, release and confirm to the other; with the *mutual* covenant and grant; that each party shall forever peaceably, quietly have, hold, occupy, &c., free and discharged from all title, interest, claim and demand of the others, their heirs and assigns, &c.

The deed is executed and acknowledged by *Etheldra* the wife of *Morgan Harris* in due form, by privy acknowledgment under the act of 1766.

To establish the facts that *Samuel Chapman* was a partner in the acquisition of *Morris' Landing*, that *Morris* agreed to sell out his interest to *Chapman*, and that in part performance of the agreement he was put in possession of the land, the appellee relies upon the evidence of *John G. Chapman* and *Mrs. Elizabeth Chapman*, the first the son, and the last the widow of *Samuel Chapman*.

To the competency of these parties as witnesses the appellant excepts, insisting that if *Mrs. Harris* is evicted from her moiety by one claiming a better title, she has her remedy over against *John G. Chapman*, or against the moiety assigned to him; and as to *Mrs. Chapman* the widow, that she hath a direct interest in establishing the title of her husband, by reason of the dower resulting to her from the seisin, if established.

In this state co-heirs are assimilated to co-parceners constituting together one heir. 5 *Gill*, 132. And at common law as between them, every partition has annexed to it the warranty implied, that if by defect of title in the ancestor, either loses any part or share of the allotment by eviction, it is treated as if no partition had been made between them. The party evicted, may enter upon the others and defeat the partition, as for condition broken, or may vouch them to warranty, and obtain recompense for the part so lost.

Upon this theory it is assumed, that supposing the appellant to succeed in his ejectment suit, *Mrs. Harris* could treat the partition as a nullity, and require it to be reformed, or proceed in chancery against the proposed witness her co-heir, to recover the moiety of her loss in value.

Can such right of re-entry exist here? All covenants that arise from implication of law, are necessarily controlled or annulled by other express covenants between the parties. The generality of the implied covenants, is by mutual consent thus restrained and qualified. 4 *Coke*, 80, *Noke's case.* And this in subsequent authorities is recognized as the settled and established rule of law. *Deering vs. Farrington,* 1 *Mod.*, 113. 4 *Bingh.*, 678. 4 *Kent*, 469.

The parties to a partition as parceners may therefore regulate among themselves the extent and limit of their future liability, by the introduction of express covenants to that intent; and will be considered as holding their separate shares independent of any implied warranties, or other conditions than what they have themselves chosen to express. And where the party covenants for quiet enjoyment and possession against himself and those claiming under him, he excludes the idea of a covenant against all the world. It is obvious that neither party could recover on this covenant for an eviction by a stranger. And it seems to be conceded in the argument, that if the right of re-entry for the breach of a condition implied, could in any case be allowed in this country, yet *Mrs. Harris,* if she had been *sole* at the time of the partition, would have been barred by her covenant.

But it is insisted, that as she was covert at the time, her covenant is not binding. As to the obligation of these express covenants upon a married woman, the authorities are not altogether without conflict. It is a well settled principle that the wife is incompetent to bind herself by a contract.

But it has never been doubted that she may convey her interest in lands; and if so, she must be presumed to have the power to do so effectually. Provision to this intent is fully made by the statutes of our State, under which the wife is presumed to act as *feme sole,* because by the privy examination, she is free of the influence and control of the husband. And although under coverture at the time, she may by any legal form of conveyance, executed under such privy examination part with all her interest in the lands, and such conveyance

operates as an estoppel against her as effectual as if she were *sui juris.* By joining with the husband in the execution of the deed, in the language of the act of 1766, ch. 14, the wife "is barred and foreclosed forever." She is precluded from claiming against the deed, or setting up any title against the grantee.

The true and the only question in this case, is upon the effect of the deed of *Mrs. Harris;* and under the act of Assembly she has parted with all her right to the land held by her brother under that deed. That act, upon the privy acknowledgment and execution of the conveyance, confers upon her the power to do so. By whatever mode of conveyance, or in whatever form the wife parts with her property, under and in compliance with the statute, when executed, she is then by her own voluntary act precluded from afterwards disavowing it, and is bound by the conditions and terms of her own deed.

What must otherwise be the result of every such voluntary partition between parceners? It is not pretended that *Chapman* in case of eviction from his moiety, could recover damages from *Mrs. Harris* on her covenant. She has simply covenanted against her own acts; and that covenant operates by way of estoppel, to debar her from asserting a right in derogation of her grant. In the case of *Nicholson's lessee vs. Hemsley,* 3 *H. & McH.,* 409, relied on by the counsel for the appellant, it is admitted that a *feme covert* by deed and privy examination, may effectually convey her estate in lands, and by words of grant and covenant debar herself of all interest therein. All that was there claimed, was that the wife could not covenant so as to make herself liable in damages. And if in this case the appellee is in no form liable to *General Chapman,* more particularly not under the restricted covenants between them, upon what just principle can he be bound to her? Her only *forum* would be a court of chancery, where equality is equity, and where her claim against him, under a covenant, not mutual or reciprocal would be rejected. For if as *feme covert* she could claim to be bound by no such covenant, can she, at the same time, claim to bind him?

As regards the incapacity of *Mrs. Chapman*, the mother, there is still less force in the objection that proposes to disqualify her as a witness. She is no party to the partition, and parceners only can vouch each other. Her portion was voluntarily assigned to her, and in view of the partition which the co-heirs afterwards made between themselves. Dower may be assigned by parol. The assignment here was made, as the testimony discloses, by the mother's first taking by *consent of the parties*, what she thought a proper equivalent, and the remainder was then valued and divided. While she thus claims protection for her dower, she is bound to give protection to none. If her testimony should establish the seizin of her husband in *Morris' Landing*, she can assert no claim to dower in it, under the consent and arrangement between her and the heirs of her husband. The partition shows that the dower accepted by her, had reference to this land as part of the estate of her husband, in the division of which her right of dower was definitively acted on. And if any attempt could now be made to disavow it, would it for a moment obtain the sanction of a court of equity, where alone the claim could be entertained?

The competency of these witnesses thus established, we proceed to a brief comment upon their testimony. The ability and ingenuity of counsel in the attempt to reject it, indicates, at least, its important bearing on the case; and we concur with the chancellor, that by it the case of the complainant is sustained. *John G. Chapman* heard, both from his father and the appellant, that this vacancy of *Morris' Landing*, was first brought to their notice by the elder *Chapman*, and that it was agreed between *Morris* and *Samuel Chapman*, that it should be taken up on joint account. It is true, the patent was issued in the name of *Morris;* but that fact is satisfactorily explained as part of the agreement. The vacancy adjoined the lands owned by one of the *Jenifer* family, and *Morris* "alleging that *Jenifer* had once interfered with him in relation to some land or some other transaction," sought the consent of *Chapman* to take it up in his own name, which was agreed to. *Chapman* was to have half the land, and with that understand-

ing and agreement, it was taken up. The caution money is proved to have been paid by *Chapman*, and the receipt of the treasurer is produced and proved to shew its applicability; being for $77.27, received from *S. Chapman*, "for caution and improvements on *William Morris'* certificate, called *Morris' Landing*, for fifty-four and a half acres," and there is evidence to show, that this money was paid by *Chapman* on account of their agreement to take up this vacancy, and hold the land for joint account of both.

It was thus held until 1821, the legal title being in *Morris*, when as the evidence shows, a further agreement was made between them, to sell to *Chapman* the other half; and if he succeeded in purchasing lands from *Jenifer*, adjoining, for which he was then treating, he was to have this other half of *Morris' Landing* at the same price per acre.

As the result of this agreement, we find *Samuel Chapman* in possession of the whole at his death, and the complainants claiming title by descent from him, allege that they are in, under the part performance of the agreement between the appellant and their ancestor, in his lifetime. It is no where pretended that *Chapman* evicted *Morris*, and it is not attempted by the appellant to shew that *Chapman* came in under any other title or agreement. It is not established that he went into the possession as tenant to the appellant; and *John G. Chapman* proves that his father received the rent from 1823 up to 1825, when he died; and his impression is that he was always in possession. Since the death of the ancestor the possession has continued in his heirs. The partition took place in 1827, although the deed between the parceners was not executed untill 1832. The bill of complaint in this case was filed in 1833, and the witness never heard of any claim of *Morris*, until the ejectment suit was instituted, which it is the purpose of the bill to enjoin, and to enforce from the appellant a specific performance of his contract.

The testimony of *Mrs. Elizabeth Chapman*, in all its essential particulars, confirms the agreement as proved in the evidence of *John G. Chapman;* that *Samuel Chapman* was in

possession from the time it was taken up until his death; and within her knowledge the rents were sometimes paid to him.

There is evidence by witnesses produced on the part of the appellant, to shew that they held as tenants under him and accounted to him for the rents, and that they considered the appellant the owner of the land; and an order drawn upon *Chapman* to pay the rent to *Morris*, is used to repel the title set up by *Chapman*. There is no proof, however, that the order ever reached *Chapman;* or if it did, that he paid the whole amount to *Morris*. Relying upon that portion of the testimony which explains the motive, why *Morris*, until the purchase of the other moiety by *Chapman*, held the patent and remained the ostensible owner, it is not inconsistent with the agreement, that he should appear to the world as the owner of the whole.

*Rye* and *Dunnington*, the witnesses, might therefore properly conceive that they had rented *Morris'* land; and *Morris* so renting to them, is not incompatible with the existing rights of *Chapman*, under the declarations of *Morris* himself, that he had sold the lands to *Chapman*.

The copy of accounts between *Samuel Chapman* and the appellant, filed in this court under an agreement of the counsel, whatever influence (if any) it might have in the decision of the cause, we are compelled to reject. It is produced here in the argument at the bar, and the counsel for the appellee insists, that the agreement embraced *only* "the copy of certain accounts *already filed* in this cause," and is expressly limited to such accounts. Their introduction being opposed upon this ground, we cannot say that the agreement was intended *to* mean more than it expresses.

DECREE AFFIRMED.